# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

```
UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )    CRIMINAL ACTION
                                 )
v.                               )    No.  09-10032-01
                                 )
LAWRENCE M. SIMONS, SR.,         )
                                 )
                Defendant.       )
_____)
```

## MEMORANDUM AND ORDER

Before the court are the following:

1.   Defendant's application to proceed in forma pauperis (Doc. 69);

2.   Pro se motion pursuant to 28 U.S.C. § 2255 (Doc. 70);

3.   Pro se memorandum in support (19 pages) (Doc. 71);

4.   Pro se affidavit (11 pages) (Doc. 72);

5.   Government's response (Doc. 73);

6.   Pro se reply (Doc. 74);

7.   Supplemental brief of appointed counsel (Doc. 91);

8.   Pro se motion to amend with supporting memorandum (21 pages)(Docs. 92 and 93);

9.   Government's response to counsel's supplemental brief (Doc. 94); 10.  Pro se letter to the court (6 pages) (Doc. 95);

11.  Pro se motion for evidentiary hearing (19 pages) (Doc. 102); and

12.  Pro se "conclusory affidavit" (5 pages) (Doc. 106).

In addition to the foregoing, the court has considered the transcripts of defendant's plea and sentencing; transcript of the

February 27, 2012 evidentiary hearing, plus exhibits; defendant's plea agreement, petition to plead guilty, presentence report and the order of August 3, 2011 collecting defendant's numerous complaints about his § 2255 appointed counsel and denying his request for different counsel (Doc. 90).

## Introduction

On March 31, 2009, the grand jury returned an indictment charging defendant with 36 counts of distributing and dispensing controlled substances not for a legitimate medical purpose and beyond the bounds of medical practice. The majority of the charges arose following defendant's termination in October 2007 as a medical doctor at the notorious pill mill known as the Schneider Clinic located in Haysville, Kansas. Defendant continued to see some of the clinic's "patients" at his residence. He also treated patients over the telephone. The owners of the clinic, Stephen and Linda Schneider, were convicted in a separate proceeding and are serving long prison sentences. The case is on appeal.

Defendant was represented throughout the proceedings in this court by retained counsel, E. Jay Greeno, of Wichita. Mr. Greeno specializes in criminal defense work, has appeared in the undersigned's court on countless occasions and enjoys a well-deserved reputation for skillful and effective representation of his clients. Ultimately, defendant entered into a plea agreement and plead guilty to two counts of distributing Fentanyl[1] to Crystal B. The plea

---

[1]Fentanyl is a potent, synthetic narcotic analgesic with a rapid onset and short duration of action. Historically it has been used to treat breakthrough pain and is commonly used in pre-procedures as a pain reliever as well as an anesthetic in combination with a

agreement, to which defendant was sworn, set forth the following factual basis:

> On November 16, 2007, Defendant Lawrence Simons signed two prescriptions written for Crystal B. One prescription was written for 15 dosage units of Fentanyl 100 mcg and the other prescription was written for 15 dosage units of Fentanyl 75 mcg. On January 15, 2008, Defendant Lawrence Simons signed two additional prescriptions written for Crystal B. One prescription was written for 15 dosage units of Fentanyl 100 mcg and the other prescription was written for 15 dosage units of Fentanyl 75 mcg. It is unlawful for a physician to prescribe controlled substances unless the prescription is issued for a legitimate medical purpose and the physician issues the prescription in the usual course of professional medical practice. The prescriptions issued to Crystal B. were not issued for a legitimate medical purpose nor were they issued in the usual course of the defendant's medical practice because the defendant had never established a physician patient relationship with Crystal B. In fact, the defendant had never met Crystal B. The above actions occurred within the District of Kansas.

The unobjected-to portion of the presentence agreement pertaining to Crystal B reads as follows:

> In reference to "Crystal B," (hereafter known as Crystal), Dr. Simons admitted that he wrote prescriptions for Crystal, but he never treated her in person nor did he ever meet her in person. Dr. Simons stated that he relied on Jeffery Brooks (not named in the Indictment) to inform him of the issues that she was experiencing so Dr. Simons could prescribe controlled substances. Dr. Simons prescribed medications (Fentanyl, Oxycontin and Hydrocodone) to Crystal from October 2007 through April 2008. On March 26, 2009, Crystal was interviewed by agents and she disclosed that she has never met Dr. Simons nor had any type of patient-doctor relationship with Dr. Simons.

Doc. 51, ¶ 27. As will be seen, defendant does not deny that he committed the acts set forth; rather, he wants to weasel out of responsibility for them and their consequences by placing blame on others, including his counsel.

---

benzodiazepine. Fentanyl is approximately 100 times more potent than morphine.

<u>Procedural History</u>

On October 5, 2009, defendant appeared with Mr. Greeno to enter his plea. Out the outset of the plea hearing, the court ascertained that defendant was 53, had a medical degree, had had sufficient time to discuss his case with Mr. Greeno, was satisfied with Mr. Greeno's representation, was prepared to proceed notwithstanding the medications he was taking, that his decision to plead guilty was his alone and that he understood that his responses were under oath. The charges to which he proposed to plead were explained along with the elements of the charges, the maximum penalties and the concept of supervised release. In particular, the court advised defendant: "Supervised release means that during that period you have to comply with certain terms and conditions imposed upon you by me and those – some are obvious that you can't violate the law; but there would be some other terms and conditions which probably apply to you because of your former profession as a physician. I don't know exactly what those would be." Defendant acknowledged that he understood. The court ascertained that factual basis of the plea agreement accurately stated what happened and what defendant did. The court explained how defendant's sentence would be calculated and the significance of the presentence report. The court specifically explained the direct appeal and collateral attack waiver contained in the plea agreement. Defendant assured the court that he understood the plea agreement as well as the written petition to enter his plea and in particular his understanding that "one of the things that you are doing in this petition is admitting under oath that you committed the offenses charged in counts 10 and 15." Finally, the court explained in detail

defendant's rights in connection with a jury trial and the rights he was giving up by entering a plea. (Section 2255 hearing transcript, Gov. Ex. 2).

A presentence report was prepared which stated, in part, that from February 12 to November 19, 2004, defendant was employed in Wichita as a physician for Advanced Anesthesiology and Pain Management Associates. He was terminated secondary to his inability to adequately perform job requirements and would not be considered for re-employment. In 2005, he worked for Integrated Medical Center in Wichita and then, from 2005 to 2007, he was employed at the Schneider Medical Clinic. He was terminated in October 2007. The presentence report also reflected that defendant had surrendered his Kansas medical license. None of these portions of the presentence report were objected to.

Defendant appeared for sentencing on December 21, 2009. Defendant stated that he had reviewed the presentence report, discussed it with Mr. Greeno and that there was nothing in the report which he wished to change or correct. He re-confirmed that he was satisfied with the way Mr. Greeno had handled his case. Mr. Greeno expressed his concern regarding the court's December 16, 2009 letter indicating his intention to possibly vary upward from the guideline range (Doc. 54) and requested additional time to research the matter of an upward variance. The court granted Mr. Greeno's request and continued sentencing until January 11, 2010.

At the commencement of the second sentencing hearing, Mr. Greeno indicated that he had not found a Tenth Circuit case dealing with his concern about an upward variance. The court acknowledged receipt of

defendant's pro se January 8, 2010 letter in which he claimed that he had no criminal intent in connection with his actions. The court stated that if defendant had no criminal intent, the court would set aside defendant's plea and set the matter for trial. Mr. Greeno explained: "and that's the whole basis for our plea, is he did not follow standard medical practice. I think what Dr. Simons means when he says he had no criminal intent is that he did not do it for money, he did not do it with any intention that those prescriptions be used to distribute controlled substances for unauthorized purposes, that he had a 'good-faith' belief at that point that those prescriptions were actually going to the patients he had written them for. However, he didn't take any steps to make sure that was in fact the case, which he understands and recognizes that he should have, and he will admit that to the court, and that was the basis for our plea in this particular case . . . if you want to hear it from Dr. Simons, but that's exactly where we're at here." Mr. Greeno amplified on his explanation of defendant's conduct and ultimately the following occurred:

      Mr. Greeno: Dr. Simons says that he indeed did write those prescriptions outside the course of his medical practice.

      The Court: Put him under oath.

      The Clerk: Please stand and raise your right hand.

               LAWRENCE M. SIMONS,

having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

-6-

The Court: All right. Now, you can tell me, Dr. Simons, Mr. Simons, you've surrendered your license, haven't you? You're no longer a doctor, are you?

The Defendant: I believe I've retained my M.D., sir, even though I've surrendered my license.

The Court: Whatever. I don't mean to insult you in any way, one way or another, but you need to tell me, if you want, under oath, that whatever you were doing in this case was outside the usual course of professional practice.

The Defendant: It was outside the course of usual practice.

The Court: And why?

The Defendant: Because I did not examine Crystal B personally.

The Court: Are you satisfied, Mr. Greeno, that that meets the standard?

Mr. Greeno: I am.

(Sentencing Transcript at 15-16)

The court then heard from defendant in mitigation. As part of the colloquy, the court addressed defendant:

THE COURT: But you still haven't told me why you did this, either in your letter or here today. You know, this is the -- I was sitting up here trying to think of an analogy to my job, and I will say, I will tell you very frankly, I consider a physician's duties and responsibilities to be much greater than mine. You understand that? But do I have to be told, as a judge, that

-7-

it would be wrong for me to accept payment from someone or even no payment, to sentence someone to a lesser offense or to shave one of my decisions for whatever reason? I mean, I can't believe that, in your training and experience as a physician, whatever your situation was, that you didn't know that this was not -- whether it was legal or not, that it was not appropriate for a physician to prescribe narcotic substances, dangerous narcotic substances, to someone you didn't even know. Weren't you taught that in medical school?

THE DEFENDANT: To my years of training, sir, and rightly so, and in those years of training, I was taught to trust in others, in tissue [sic] extenders, and all I can say is I misplaced my trust through my own fault in a physician extender.

THE COURT: I don't know what that is. Is that the same as a P.A.?

THE DEFENDANT: Like a medical assistant, sir, who had told me that he had the physician -- he had the patient rolls of the clinic and that these people were on the clinic rolls and they were getting those medications, and when I sought after those records and that physician extender or medical assistant or P.A., as you call them, I could not locate that person nor those clinic rolls to prove that they -- these patients were, indeed, patients of the clinic and were on those particular medications.

THE COURT: Did you go back to the physician extender

or the P.A. and say, I can't locate this person?

THE DEFENDANT: I did, sir. I communicated by telephone, and tried to get address to the physical location where the charts were, and I was misled.

THE COURT: How?

THE DEFENDANT: The address didn't exist.

THE COURT: Wouldn't that have suggested to you that something funny was going on here, that maybe that you ought to look into this, or just say I'm not going to do it? I don't understand why -- since you weren't say you weren't getting any pay or anything else, why you would be motivated to prescribe narcotic substances to somebody you didn't even know existed, after you made the inquiry and found out that there wasn't any record of them.

THE DEFENDANT: By the time I made the inquiry, sir, and found out the records would not be accessible to me, I had stopped, I had stopped writing, and indeed as in my letter to you, when particular pharmacists called me and said prescriptions were being presented with my name, rather than collude or anything like that, I asked them to contact authorities and the appropriate people were arrested at that time.

THE COURT: And who was that?

THE DEFENDANT: To my knowledge, sir, Jeffrey B.

THE COURT: What's the last name?

THE DEFENDANT: Brooks.

THE COURT: And was he an employee at the Schneider Clinic?

THE DEFENDANT: He was a patient, sir, before –

THE COURT: A patient?

THE DEFENDANT: He was a known patient that I knew for a fact and knew for a fact what medications he was on.

THE COURT: Well, he wasn't a physician extender then.

THE DEFENDANT: No, sir, but --

THE COURT: Who's the physician extender that you talked to?

THE DEFENDANT: Robbie Swonger (phonetic), sir.

THE COURT: And Jeffrey B. was Crystal's husband?

THE DEFENDANT: Yes, sir.

THE COURT: Crystal, is that the right name?

THE DEFENDANT: Yes, sir.

(Sentencing transcript at 27-29).

The court then proceeded to discuss the statutory factors under § 3553:

THE COURT: Fifty-three years old needs to have clarification of the fact that physicians don't have any business doing what you did. If you're just now being clarified on this, I don't know how you got as far along as you got. The law does not require you to know that what you did was a violation of some specific statute. And how you didn't know that this was not contrary -- that this was contrary to law to do this is beyond me.

Provide just punishment, to afford deterrence. Yes, Mr. Greeno is right. You're going to be deterred from his because any jurisdiction in this country that would give you a license to practice medicine or anything related to

-10-

controlled substances, I can't imagine that there is such
a jurisdiction. But I'm going to put special conditions on
you, at least for your term of supervision, that'll make
sure that when you get out of the penitentiary you won't
get employed anywhere where you could do this again or have
anything to do with controlled substances.

(Sentencing transcript at 26-37).

Ultimately the court imposed a concurrent guideline sentence of
24 months with the following condition:

He is prohibited from participating directly or indirectly
in any fashion in any type of medical recommendation,
consultation, treatment, or care of any person, and is
further prohibited from engaging, directly or indirectly,
in the business of operating any medical facility,
clinical -- clinic or other health care-related business in
which health care services are rendered to patients. He
shall not seek to apply to have reinstated medical
licenses, and he shall not apply for or seek to obtain any
DEA registration number which would allow him to dispense
directly or indirectly any controlled substances. And he,
as I say, is prohibited from dispensing any prescribed or
non-prescribed medications of any sort.

(Sentencing transcript at 40-41).

The court concluded by advising defendant of his right to appeal.

Defendant executed a written waiver of appeal (Doc. 63).[2] Defendant entered Bureau of Prisons custody and ultimately was released to a halfway house in Wichita. In February 2012, while still at the halfway house, defendant tested positive for controlled substances not prescribed to him by the medical staff. Defendant told an investigator that "while he was going through what was left (in a storage unit) he found a bottle of meds and took some. He really had not felt that they were drugs but honestly didn't know what it was cause it has been such a long time since he had put it in storage." Defendant's own statement was, in part: I found a sample bottle for the Flomax. The pills inside did not resemble the current Flomax formulation–I honestly was not sure what they were . . . ." The reader may wish to keep in mind that this is the excuse of a former

---

[2]The waiver reads as follows:

My lawyer has advised me of my right to appeal the conviction and/or sentence imposed in the above-captioned case on January 11, 2010 notwithstanding the fact that I waived or gave up my right to take a direct appeal to the Tenth Circuit, as well as my right to file a motion pursuant to 28 U.S.C. § 2255. I was also advised by my lawyer and the court that if I choose to appeal my case, a notice of appeal must be filed on my behalf in the district court within 10 days. I understand that should I wish to appeal, I can apply to have a lawyer appointed to represent me on appeal.

After having been advised of my right to appeal the conviction and/or sentence imposed in this case, and having discussed this right with my lawyer, I hereby waive, or give up my right to appeal and specifically direct my lawyer not to file a notice of appeal.

I am satisfied with the representation that was provided me by my lawyer.

doctor who says he wants to resume practicing medicine.

Defendant is now on supervised release.

Defendant's § 2255 Motion

Defendant's initial pro se § 2255 motion contended that Mr. Greeno's representation was ineffective because he did not advise defendant that "pleading guilty could effectively result in the permanent loss of license to practice medicine, fail to challenge and preserve for appellate review the court's application of §§ 1B1.3 and 2D1.1 which held petitioner accountable for forged prescriptions and failed to file a motion for sentence variance." Defendant claimed that had he known that he could lose his medical license, he would have insisted upon going to trial. The motion was accompanied by two affidavits. Defendant's first affidavit alleged that Mr. Greeno told him he would be barred from practicing medicine only during the three year term of supervised release. Then, on approximately December 10, 2010, Mr. Greeno supposedly told defendant that he probably would never be able to practice medicine. Defendant averred that had he known the latter, he would have insisted on a trial.

Defendant's second affidavit, consisting of ten pages, asserted the theme which he has pursued, in one form or another, throughout this matter: that he was a hard-working, empathetic, sympathetic, patriotic, but naive, physician who was taken advantage of by others and was now being "more than punished for choosing the wrong employment."

Even after the court had appointed counsel to represent defendant and after counsel had filed a brief on defendant's behalf (Doc. 91), defendant filed a pro se motion to supplement his original motion

-13-

adding claims that he was not advised and did not understand that physicians are exempt from prosecution when distributing a controlled substance for a legitimate medical purpose, that Mr. Greeno had promised defendant that he had a verbal agreement with the government for no jail time and that he told the court he was satisfied with Mr. Greeno's representation because of Mr. Greeno's supposed oral promise that he would not go to prison and would have to surrender his license only for three years.

Finally, before the evidentiary hearing, defendant filed yet another pro se submission in which he raised new claims including excessive force during the "DEA raid" of his home, coercive prosecutorial interviews, declination of an offer for "lie detector" testimony, entrapment, misrepresentations in connection with the proceedings before the Kansas Board of Healing Arts, having to appear for arraignment in a jump suit and handcuffs and one-sided media reporting.

<u>Evidentiary Hearing</u>

The evidentiary hearing was held on February 27, 2012. Defendant appeared with appointed counsel. The first witness was G. Craig Robinson, who represented defendant in connection with the administrative proceeding to revoke defendant's medical license. The proceeding ended in a consent order filed September 8, 2009 in which defendant agreed to surrender his medical license. The consent order provided that defendant could reapply at any time for licensure ". . . when he feels he would be able to demonstrate to the board that he is fit to practice." Mr. Robinson interpreted that language to say that defendant could immediately reapply for licensure,

-14-

notwithstanding the provisions K.S.A. 65-2844 which provides, in substance, that a physician whose medical license has been revoked may apply for reinstatement after the expiration of three years upon proof by clear and convincing evidence to show sufficient rehabilitation to justify reinstatement. Apparently under the deal worked out by Mr. Robinson, defendant was not subject to the three year waiting period because his license had been surrendered, not revoked. The significance to the court of Mr. Robinson's testimony, however, was that although defendant had surrendered his license at the time he entered his plea of guilty there was a chance, however slight, that he could regain the right to practice medicine in Kansas.

The next witness was Mr. Greeno. Mr. Greeno referred defendant to Mr. Robinson in connection with matters before the Kansas Board of Healing Arts. He was aware that defendant had surrendered his medical license prior to defendant's plea of guilty.

The reader will recall that defendant initially was charged with over 30 counts of unlawful dispensation of controlled substances. Defendant informed Mr. Greeno that some of the prescriptions were forged and after working with defendant to determine which prescriptions were forged and which were genuine, Mr. Greeno spoke with the prosecutor who told him that he was not interested in litigating whether certain prescriptions were, or were not, forged. Mr. Greeno and the prosecutor entered into plea negotiations. Mr. Greeno made clear that probation was "probably my goal in the end" and the prosecutor stated his interest "in making sure Dr. Simons didn't practice medicine any more."

The plea agreement itself contained no provisions regarding

defendant's licensure. Because defendant's license was originally issued in Pennsylvania, Mr. Greeno contacted a Pennsylvania attorney who specialized in representing doctors with regard to their medical licenses. He encouraged defendant to contact the attorney, particularly after receiving the court's letter indicating his intention to impose conditions to prevent defendant from participating in any sort of employment in the medical field or where he could have access to controlled substances.

Mr. Greeno's particular concern related to the court's letter that he was considering a variance above the guideline range. Mr. Greeno testified:

> Q But Mr. Simons had made it clear to you that getting a medical license back was very important to him?
>
> A He did. And I told him I could not -- although I wasn't trained in that area and not familiar with that area, I found it difficult to believe that a convicted felon would be able to get a medical license right away.
>
> Q Did you tell Mr. Simons that there was really nothing you could do about the judge wanting to impose this restriction?
>
> A I probably did.
>
> Q Did you explain to him that Judge Belot had the authority to impose any conditions that he felt were reasonable and necessary?
>
> A I think so.

(Evid. Hrg. Trans. at 33).

Mr. Greeno could not recall whether he specifically discussed

-16-

with defendant U.S.S.G. § 5(f)1.5 which deals with occupational restrictions. Mr. Greeno acknowledged that at the time of sentencing he was not aware of the Tenth Circuit decision in <u>United States v.</u> <u>Wittig</u>, 528 F.3d 1280, 1286 (10th Cir. 2008) which addresses occupational restrictions. He candidly admitted that he did not argue against any occupational restrictions.

On cross examination, Mr. Greeno touched on a pro se claim raised by defendant: that he was not made aware of the charges and specifically the requirement that the government prove that the prescriptions were not for a legitimate medical purpose:

Q There was a question -- you had a discussion with the Defendant about what his intent was. Did you also discuss with the Defendant the elements that the Government would have to prove to convict him on the charges?

A Yes.

* * *

Q And did you explain to him that it wasn't just a – whether there was a legitimate medical purpose, but also whether or not he had established a physician/patient privilege -- or, excuse me, a physician/patient relationship with the individuals?

A Yes, I did.

Q And did the Defendant admit that he had not established a physician/patient relationship with Crystle B as referenced in Section 2 the factual basis for his guilty plea?

A We had a lot of discussion about that. And if this is the

same one that I'm remembering, he indicated to me that he talked to a woman who represented herself to be Crystle B on the telephone who explained to him that she had been involved in a car accident and that she had this ongoing pain for which she had been treated at the Schneider Clinic. And I was quick to point out to him that you still can't prescribe medications for her until you actually see her because you don't know who you're talking to on the telephone.

Q Did he admit he did not know who he was talking to on the telephone?

A Well, he, he told me that he had been ill-advised and told that that was in fact Crystle B.

Q But he had never conducted a physical exam on her?

A No.

Q Never obtained a medical history from her?

A No.

Q And had never even seen her?

A That's correct.

Q And despite that, he admitted that he had issued written prescriptions for controlled substances for her?

A Yes, as I recall.

(Evid. Hrg. Trans. at 52-54).

Another issue raised by defendant related to allegedly forged prescriptions. Mr. Greeno testified:

Q And did the Defendant review the prescriptions that were identified within the presentence report?

A Yes. In fact, on some of them I noted on my initial copy that I was going to object to this paragraph and object to this paragraph. And then we went back and compared the prescription medications that were described in those paragraphs with the actual evidence in this particular case and they worked out. So we did not actually file a formal objection to each one of those paragraphs. But I know there were a number of paragraphs we had some questions about and we went back and made sure that they weren't forged prescriptions and that they were actual prescriptions that he had written.

Q Now, you used the term we. That would be yourself and?

A And Mr. Simons.

Q So you actually made a prescription by prescription comparison to the counts contained within the Superseding Indictment and identified within the presentence report?

A Yes. Within the presentence investigation report. I wanted to make sure that we were absolutely clear that there were no forged prescriptions contained in that PSI that he was getting relevant conduct for.

(Evidentiary hearing at 60-61).

Defendant testified at length. He explained how important it was to him that the Board of Healing Arts consent order allowed him to make immediate re-application for his license. Defendant expressed his "contention" that at least some of the prescriptions used to calculate relevant conduct were actually forged prescriptions and he identified counts 13, 14, 19, 20 through 25. He claimed that he never

saw the court's letter with respect to an upward variance or departure and denied that Mr. Greeno discussed with him a condition regarding prohibition from practicing medicine. Defendant claimed that had he known about such a condition, he never would have agreed to plead guilty. He also claimed that he did not know until after he was released from the penitentiary and in a halfway house that he would have to comply with the "drug offender registration process." Had he known, he would not have entered his plea.

Defendant then launched into a ten-page soliloquy in which he attempted to portray himself as a caring physician who abused by government agents ("It was a knockdown of the door and aiming of laser-sighted assault rifles at a physician standing there in his boxer briefs . . . I was tackled by agents in riot gear, 20-25 agents from various organizations. I was tackled and handcuffed and shackled."), threatened by the prosecutor (but in the presence of his attorneys), made the victim of ". . . unreliable, unsubstantiated claims by other people that just wanted to protect themselves and look for a scapegoat," on and on. Finally, when reminded by his counsel that he was being repetitive, defendant testified:

> A  Okay. I'm sorry. I guess -- I guess just to summarize then, my request of Your Honor, the motion to vacate, set aside or correct sentence was basically because I really made the plea involuntarily and unknowingly. I, I believe I didn't receive a proper firm explanation in and grasping of the nature of the elements of the offense for a practitioner to be so charged. And I felt without notice of the elements of the offense and considering what my, my

> intent was, I felt the charges hit me with this, as I said,
> this circumstance that was beyond my realm. And if I had it
> to do all over again, I think I would have gone to trial
> and appealed to a jury, a jury of my peers, and expressed
> myself and would have been seen as a concerned physician
> rather than a drug trafficker. Thank you for your
> indulgence.

(Evid. Hrg. Trans. at 93-94).

On cross-examination, defendant was asked about some of the responses he had made during his hearings before the court. When the prosecutor asked defendant about the court's questions regarding defendant's understanding of the plea agreement, here is what defendant said:

> Q The Court asked you if you needed additional time to
> speak with Mr. Greeno about the change of plea, didn't it?
> A At that time, sir.
>
> Q And the Court asked you if you had read the plea
> agreement, didn't it?
> A At that time, sir.
>
> Q And you told the Court that you had in fact read the plea
> agreement; correct?
> A At that time.
>
> Q And the Court asked you if you understood the terms of
> the plea agreement, didn't it?
> A At that time, it did, sir.
>
> Q And you said that you understood the terms of the plea
> agreement, didn't you?

A To the best of my ability at the time, sir. What I
basically think I'm saying is after two years in prison, a
large percentage of which was spent in libraries and doing
more research, I feel that this waiver was part and parcel
of what I've complained about in view of the ineffective
assistance of counsel. And that's why, it being a direct
product of that same ineffective assistance, after my
research later on, I decided to do the 2255 and the amended
2255, sir.

(Evid. Hrg. Trans. at 115).

The prosecutor questioned defendant regarding his claim that he
did not understand the elements the government would be required to
prove:

Q Do you recall the Court discussing the elements of the
offense with which you were charged with you?

A I recall that, sir. And later research from prison I
determined the elements did not appear to have been
correctly stated and represented to me in a fashion that
would cause me to admit to 21-841(a).

Q You admitted that the prescriptions that you wrote to
Crystal B were issued outside the course and scope of
typical medical practice, didn't you?

A I did because it was explained to me, sir, at that time
that because I didn't reexamine Crystal B----, that that
was considered outside the scope of medical practice. And
at that point I think you had already had a side bar with
Mr. Greeno and I again felt, frankly coerced and threatened

-22-

that if I didn't accept the plea, I could be in a lot more

a very terrible situation.  So I may have said that. But I

tell you now under oath I did consider that a

physician/patient relationship, whether I did a repeat exam

on Ms. B---- or not.

(Evid. Hrg. Trans. at 106-07).

Defendant was then asked about paragraph 2 of the plea agreement

which set forth the facts and circumstances of the offense:

Q And at the change of plea hearing you admitted that the

factual basis of the plea agreement, Section 2, is what you

had done that made you guilty, didn't you?

A I'm not looking at Section 2, sir.

Q Look at Government Exhibit 1.

A I was in error, sir. The prescriptions issued to Crystal

B were for a legitimate medical purpose and in the course

of medical practice. Certainly not as a drug pusher or drug

trafficker.

Q You've already told us that you were under oath at

the change of plea hearing, haven't you?

A Yes, sir.

Q I'm going to hand you what's been marked as Defendant

Exhibit 2. Transcript of plea of guilty. Page 9. Line 9.

The Court: "All right. Now, Paragraph 2 is the most

important paragraph because it sets forth the facts which,

if true, justify my decision to accept your plea. Have you

carefully gone over Paragraph 2 and discussed it with Mr.

Greeno?"

Q And what was your response?

A My response was: I have, sir.

Q The Court: "Does Paragraph 2 accurately state what happened and what you did?"

Q And what was your response?

A My response at the time was, in fact, it does, sir. But as I told you now under oath, I do not believe it did.

Q You were under oath at that time; correct?

A And under threats, I believe, of extensive prison time as well.

Q You were under oath at the time of the change of plea hearing and your response to the Court's question does Paragraph 2 accurately state what happened and what you did; is that correct?

A I believe that to be correct.

(Evid. Hrg. Trans. at 107-08).

The prosecution inquired about the court's admonition regarding promises of sentence: "He [Mr. Greeno] cannot promise you any guideline sentence, or any sentence at all for that matter. You understand that?"

Q And what was your response?

A My response was: I do, sir.

Q So you knew at the change of plea hearing that even if Mr. Greeno said he was going to try and get probation, that he couldn't promise you that you would get probation. Isn't that correct?

A That would be correct. I guess I'd only differ in a

discussion of a promise versus an assurance by an attorney.
And my impression by my representing attorney was it was
gonna go toward probation. But I do see your point, sir.
(Evid. Hrg. Trans. at 110).

When asked about the paragraph in the plea agreement regarding
waiver of appeal and collateral attack, defendant testified:

Q The very first phrase, the Defendant knowingly and
voluntarily waives. Now, that's pretty clear, isn't it?
Says you're voluntarily going to waive something and you
know what you're going to do. Correct?

A That is correct, sir. But in qualification, I have to say
that I've expressed to Mr. Pratt that I felt the waiver was
part and parcel of the subject of the ineffective
assistance of counsel and the waivers are included and are
a direct product of that ineffective assistance. And that's
one of the things I'm contesting.

Q In fact, the Court told you that the effect of signing
the plea agreement, and specifically Section 8, meant that
you were not going to appeal or attack your sentence at
anytime before any court at any time, didn't it?

A That was my understanding at that time, sir.

Q So at the time you signed this document, you knew that
you were waiving your ability to appeal, didn't you?

A At the time when I felt I was receiving effective
assistance of counsel, sir.

Q And at the time you signed the plea agreement, you knew
that you were waiving any ability to attack your sentence;

-25-

correct?

A Not pursuant to further action, sir.

Q And, in fact, Section 8 goes on to say that the law affords you as the defendant the right to appeal your conviction and this sentence but that you were knowingly waiving this right to appeal the sentence to be imposed within the guideline range. Correct?

A Actually, my counsel never discussed appeal with me, sir.

(Evid. Hrg. Trans at 114-116).[3]

The prosecutor asked defendant if he understood what would have happened if he did not accept the plea agreement:

Q Now, with respect to this plea agreement, you knew that if you did not accept the terms of the plea agreement, that the Government would proceed to trial on all 27 counts, didn't you?

A I believe that was indicated to me.

Q And you also were informed that if you proceeded to trial, you ran the risk of having a larger sentence of imprisonment imposed on you than if you plead guilty, didn't you?

A Yes, sir.

Q And, in fact, the Court asked you: "And I'm sure Mr. Greeno told you about acceptance of responsibility and the benefits for accepting responsibility." Is that correct?

A I believe so, sir.

---

[3]This statement is a clear lie. <u>See</u> footnote 2, <u>supra</u>, at p. 12.

(Evid. Hrg. Trans at 116-117).

Turning to the sentencing hearing, defendant was asked about the court's question at sentencing "Is there anything in the [presentence] report that you wish to change or correct?" which defendant had answered with an unqualified "No sir." Defendant responded:

> A I'm not sure, sir, if this is in reference to objections
> we already made at that point or had not made. We did make
> objections. But without seeing the document, I'm not sure
> if this is inclusive of those objections or not.
>
> * * *
>
> My response again, Mr. Metzger, is -- the response was: I
> have, Your Honor. But, again, I'm not sure if this is
> reflective of the PSI that had the objections on it or did
> not.
>
> Q The question was whether you'd read the report.
> Correct?
>
> A And, again, I reference I'm not sure which report you're
> referring to. There was a report that was submitted with
> objections at which time you had no responses. Those
> objections I think were enumerated to about ten and you
> didn't have a response from the government. I'm not sure
> which report this refers to, sir.

(Evid. Hrg. Trans. at 97-99).

Finally, defendant offered a bizarre explanation regarding the court's statement to him that if he questioned whether he was guilty, he could withdraw his plea:

> Q And, in fact, the Court told you at the January

sentencing hearing that if you had any questions about whether you were guilty or not, the Court would allow you to withdraw your change of plea. Didn't it?

A The Court did, sir. But as I think I alluded to then, there was an extensive side bar between you and my defense counsel and I felt pursuant to that side bar I was subjected to more threat and coercion that if I didn't accept the plea, it was not gonna go favorably for me.

(Evid. Hrg. Trans. at 112).

<u>Discussion</u>

When any defendant comes before the undersigned judge to enter a plea, he or she is sworn to tell the truth, both in connection with statements made during the plea hearing and in connection with the written petition to enter a plea. The undersigned judge relies on a defendant's oath particularly when, as in this case, the defendant is educated and represented by highly qualified counsel.

As the Supreme Court observed in <u>Blackledge v. Allison</u>, 431 U.S. 75, 97 S. Ct. 1621, 1629, 52 L.Ed.2d 136 (1977), the representations of a defendant, his lawyer and the prosecutor at any plea hearing, as well as findings made by the judge accepting the plea, constitute a formidable but not insurmountable barrier in any subsequent collateral proceedings. "Solemn declarations in open court carry a strong presumption of verity." The Tenth Circuit similarly has recognized that "[S]tatements made in a plea colloquy are presumed to be true." <u>United States v. Edgar</u>, 348 F.3d 867, 873 (10th Cir. 2003). "The truth and accuracy of a defendant's sworn statement at his change of plea hearing are `conclusive in the absence of a believable reason

justifying' their rejection." <u>United States v. Fields</u>, 157 Fed. Appx. 40 (10th Cir. 2005) <u>citing</u> <u>United States v. Bambulas</u>, 571 F.2d 525, 526 (10th Cir. 1978).[4]  As the Tenth Circuit recently recognized in discussing a defendant's right to withdraw his guilty plea, "Fairness and justice do not dictate that a party may compel any judicial action on the basis of a lie . . . ." <u>United States v. Soto</u>, 660 F.3d 1264, 1268 (10th Cir. 2011).  The same applies equally to a § 2255 motion, if not more so.

It is readily apparent from the aforesaid excerpts from the record that the defendant either lied to the court during his plea and sentencing hearings or in his pro se submissions and in his testimony at the evidentiary hearing.  In so doing, defendant is hoist by his own petard.  By any objective measure, defendant's testimony alone should be sufficient to justify the denial of his motion.

Defendant's plea agreement contained a § 2255 waiver.  Despite defendant's disingenuous explanations, the court finds that defendant knowingly and voluntarily waived his right to collateral review.  The waiver contained the so-called "<u>Cockerham</u> exception" (<u>United States v. Cockerham</u>, 237 F.3d 1179, 1187 (10th Cir. 2001) which the Circuit has uniformly held only applies to ineffective assistance claims specifically challenging negotiation of the plea and the waiver.  The exception does not apply to ineffective assistance claims challenging counsel's performance at sentencing.  <u>United States v. Morrison</u>, No. 10-3210, 2011 WL 286365 (10th Cir. Jan. 31, 2011).

Defendant does not contest Mr. Greeno's negotiation of the

---

[4]The court notes that the assistant U.S. attorney in <u>Bambulas</u> was Mary Beck Briscoe, now the Chief Judge of the Tenth Circuit.

waiver, which in any event is standard language in plea agreements in this court.  Indeed, for several years, the only plea agreements which do not contain the standard waiver are conditional pleas which preserve certain issues, obviously inapplicable in this case.

The court cannot identify a <u>specific</u> claim of ineffective assistance by Mr. Greeno in negotiating the plea.  Mr. Greeno negotiated a plea to two counts from an original thirty-plus count indictment.  To the extent defendant now claims that he would not have plead guilty had he known about restrictions to his right to practice medicine and having to register as a drug offender, practice restrictions are not part of the plea agreement and were not part of the negotiations.  Moreover, defendant's claims in this regard are not credible.  He had surrendered his Kansas license before entering his plea.  Before sentencing he was advised that the court was considering a practice restriction.  At sentencing, he declined the opportunity to withdraw his plea.  At no time did defendant <u>ever</u> express a wish to go to trial for <u>any</u> reason.  In other words, defendant has not demonstrated ineffective assistance by Mr. Greeno and the <u>Cockerham</u> exception does not apply.

Even though defendant waived his right to collateral attack, the court will comment on one argument made by defendant's appointed counsel: that Mr. Greeno was ineffective because he did not object to the occupational restriction imposed upon defendant as a condition of supervised release.  Counsel cites <u>United States v. Wittig</u>, 528 F.3d 1280 (10th Cir. 2008).

The court acknowledges that he did not follow the cookbook formula set out in <u>Wittig</u> but he is satisfied that the restriction was

within the broad discretion recognized in <u>Wittig</u> and, more to the point in this § 2255 proceeding, had Mr. Greeno objected, the result would not have been different. Defendant had advance notice of the court's intention and, notwithstanding his respect for Mr. Greeno, the court would have imposed the restriction even if Mr. Greeno had objected.

The restriction is more than reasonably related to the factors set forth in 18 U.S.C. § 3553 and U.S.S.G. § 5F1.5. As previously noted, the court referred to the § 3553 factors at sentencing. There is no question that a <u>direct</u> relationship existed between defendant's profession and the conduct relevant to the offenses of conviction.

One wonders how specific a judge has to be to get across the point that a physician who commits the acts of which defendant stands convicted should not be permitted to practice medicine and prescribe controlled substances. In terms of protection to the public, the court had every reason to believe that without the restriction, defendant would engage in the same sort of unethical, unprofessional and illegal behavior. Indeed, defendant validated the restriction by his own actions of taking controlled substances without a prescription and then making the bogus excuse that he did not know what they were. The court's only regret is that the restriction cannot be permanent.

Counsel's argument that the court could have imposed a lesser restriction which would have allowed defendant to be a licensed physician without holding a DEA certificate has no support in the record or in the law, as far as the court is aware. There is no evidence that a licensure board, whether in Kansas, Pennsylvania or elsewhere, will issue a license under such conditions. But once

again, even if Mr. Greeno had objected and proposed such a condition, the court would not have considered it. The same goes for counsel's argument that the court have could have restricted the type of practice engaged in by defendant or that he practice under the supervision of another physician or a probation officer or agents of the DEA. None of this court's probation officers have either the time or the expertise to manage a physician's medical practice. There is no evidence that DEA agents have such time and experience and, for that matter, even the authority to manage a medical practice. The issues of physician/patient confidentiality alone preclude such an arrangement. While the court has a difficult time imagining an ethical, competent physician who would be willing to supervise defendant, the court is not in the business of attempting to locate such an individual nor was it Mr. Greeno's job to do so. If defendant is to be licensed in the future (and the court sincerely hopes that he will not be), that will be the responsibility of the appropriate licensing agency.

## Conclusion

Defendant's application to proceed in forma pauperis is granted but his § 2255 motion is denied. Defendant's appointed counsel's duties are concluded, with the court's thanks, and he is relieved of any further responsibility in connection with this case. Should defendant seek a certificate of appealability, he will have to do so pro se or with the assistance of retained counsel.

IT IS SO ORDERED.

Dated this __27th__ day of April 2012, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE